(Reap. Dec. 10177)

HOSPITALINE, INC. *v.* UNITED STATES

Entry No. 814940, etc.

(Decided February 20, 1962)

*John D. Rode (Ellsworth F. Qualey* of counsel) for the plaintiff.

*William H. Orrick, Jr.,* Assistant Attorney General (*Morris Braverman,* trial attorney), for the defendant.

LAWRENCE, Judge: Eight appeals for a reappraisement, enumerated in the annexed schedule marked "A" and made a part hereof, present for determination the market value of certain hypodermic syringes and needles, manufactured in Japan and shipped to Gilbert & Co. in Canada who, in turn, shipped the merchandise to Hospitaline, Inc., the importer and plaintiff herein.

The merchandise was appraised as an exportation from Canada on the statutory basis of a foreign market value of similar merchandise in Canada on the date of exportation.

Plaintiff contends, primarily, that Japan should be regarded as the country of exportation for purposes of appraisement and that the invoiced and entered values represent the proper export market value for the merchandise.

Alternatively, it is contended by plaintiff that, if the court should find that Canada is, in fact, the country of exportation for valuation purposes, the court should find that there is no foreign, export, or United States value for the merchandise, in which event, it should be appraised on the statutory basis of cost of production, which is represented by the invoiced and entered values.

At the trial, the following oral stipulation was entered into by the parties litigant:

[COUNSEL FOR PLAINTIFF]:

I offer to stipulate, subject to the approval of the court, that the merchandise involved in these appeals consists of hospital or surgical supplies such as hypodermic syringes, thermometers, and so forth, manufactured in Japan, shipped to Canada, and shipped therefrom to the United States during the period from June 1, 1957, to March 1, 1958, without any change or alternation but in the same condition as originally imported into Canada from Japan;

That these articles were imported into Canada by Gilbert & Company of Torondo, Canada, and shipped to Hospitaline, Inc., of New York, an affiliated company.

I further offer to stipulate that during the period when these shipments were made to the United States there was no export value or United States value for such or similar merchandise; that the sole question involved is the existence of a foreign value for such or similar merchandise for the period in question.

I also offer to stipulate that if the court finds that such or similar merchandise was freely offered for sale for home consumption in Canada to all purchasers during the period in question then the appraised values of the merchandise are correct and that they represent such home market value; that if the court finds that such or similar merchandise was not freely offered for sale for home consumption in Canada to all purchasers during the period in question then

cost of production as defined in Section 402(a)(f) of the Tariff Act of 1930 as amended is the proper basis of appraisement and that such cost of production for the merchandise covered by each entry is the invoiced value.

I further offer to stipulate that if the court finds that Japan is the country of exportation to the United States for the merchandise here involved then the invoiced and entered values for the merchandise are the statutory export values for such or similar merchandise on the respective dates of exportation from Japan, including all costs, charges and expenses for placing the merchandise in condition, packed ready for shipment to the United States, and that on the respective dates of exportation there was no higher statutory foreign value for such or similar merchandise.

MR. BRAVERMAN: Examiner Seidel is now in court, and from information obtained from him the Government will stipulate with plaintiff's counsel with one minor correction, that the word "thermometers" be deleted from the opening paragraph of the stipulation. There were no thermometers in these shipments.

Jules R. Gilbert, president of Gilbert & Co., a Canadian corporation, the only witness in the case, testified on behalf of plaintiff that he and a Dr. William Bell were the major shareholders in Gilbert & Co. and Hospitaline, Inc., the plaintiff; that the syringes and hypodermic needles in controversy were purchased in Japan for Hospitaline, Inc.; they were marked in Japan with a Hospitaline label and shipped to Canada, where they were stored in a warehouse at Hospitaline expense, to be shipped to Hospitaline, in accordance with its requirements. None of the merchandise labeled "Hospitaline" was sold or offered for sale in Canada; it was brought into Canada as a matter of convenience and economy for storage until it was needed by Hospitaline, which did not have adequate warehouse facilities in New York. While in the warehouse in Canada, the merchandise was not processed, manipulated, changed, or altered, and was shipped to the United States in its original condition, except for relabeling the outside cartons. In some cases where Hospitaline required a quantity less than a shipping case, "we would transfer them to a carton and reship."

Gilbert further testified that when ordered from Japan the goods were actually destined for Hospitaline in New York and that the shipment from Canada to the United States was not a sale, but a transfer of the merchandise, billed at actual cost, plus a service fee which covered handling, labor, the value of money tied up, and other items incurred by Gilbert in purchasing, storing, and shipping the goods.

Gilbert also testified to his familiarity with the market in Canada for similar merchandise to that involved herein. However, in view of the disposition of the case, it becomes unnecessary to analyze this testimony.

The Government introduced a report by George W. Arnold, examiner of merchandise at Buffalo, N.Y., under date of May 19, 1958, which was received in evidence as collective exhibit A.

This report corroborates in several respects the testimony of the witness Gilbert. This is revealed in the following details appearing in the report.

1. J. R. Gilbert and Dr. William Bell are coowners of Gilbert & Co. of Toronto and Hospitaline, Inc., of New York, each being a half owner.

2. Gilbert & Co. included Hospitaline, Inc., requirements in placing its orders with the Japanese manufacturer.

3. Shipments are made from Japan to Gilbert & Co. in Toronto, where the merchandise is retained in stock until required by Hospitaline, Inc. This is done for reasons of economy and convenience, since there is no Canadian duty on the subject merchandise, and Gilbert & Co. has warehousing space available in Toronto. This avoids the necessity for Hospitaline, Inc., of carrying large stocks of merchandise and paying warehouse charges in New York.

4. All of the merchandise which is shipped to the United States is taken from stock that was ordered for and destined for Hospitaline, Inc.

5. None of the stock which was ordered for Hospitaline, Inc., entered the commerce of Canada.

6. The merchandise for sale to the United States was manufactured in accordance with United States standard specifications.

7. When sold in Canada, the merchandise is marked with the brand name "Gilbert," whereas when shipped to the United States, it is marked with the brand name "Hospitaline." In both instances, the marking is done by the manufacturer.

8. Gilbert & Co. would be unable to sell the "Hospitaline" brand in Canada "because the Canadian purchasers would believe it to be an inferior substitute to the 'Gilbert' brand."

9. Arnold's report (exhibit A), which was based primarily upon information supplied by J. R. Gilbert and D. L. Bennett, general manager of Gilbert & Co., contains the following statement:

While Mr. Bennett concedes that the prices at which this merchandise is sold to the United States does not include a profit for Gilbert & Company, he contends that the merchandise manufactured in Japan was destined for the United States, and did not, nor could not, enter the commerce of Canada. * * *

The solution of the problem presented in this case depends primarily upon two considerations:

1. The intent of the parties to the transaction.

2. The legal effect of the diversion of the merchandise. These two elements are closely associated and must be treated together.

Plaintiff, in its brief, invites the attention of the court to the following judicial authorities:

*F. W. Hagemann* v. *United States*, 24 Cust. Ct. 587, Reap. Dec. 7815, affirmed by the second division, *United States* v. *F. W. Hage-*

*mann*, 26 Cust. Ct. 708, Reap. Dec. 8007, and by our appellate court in *Id.* v. *Id.*, 39 C.C.P.A. (Customs) 182, C.A.D. 484.

*Hensel, Bruckmann & Lorbacher, Inc., for a/c Fred'k Blank & Co.* v. *United States*, Reap. Circ. 3207, page 420.

*United States* v. *Geo. E. Mallinson Importing Co., Inc.*, 14 Cust. Ct. 382, Reap. Dec. 6125.

*United States* v. *Meadows, Wye & Co. (Inc.)*, 49 Treas. Dec. 959, T.D. 41622, affirmed, without opinion, in *Id.* v. *Id.*, 14 Ct. Cust. Appls. 488.

In the *Hagemann* case, *supra*, certain merchandise, manufactured in Germany, was shipped to Holland, and finally entered at the port of New York upon an invoice, dated at Den Haag, Netherlands. The appraiser regarded the Netherlands as the country of exportation and evaluated the merchandise accordingly. It appearing from the record in that case that the goods did not enter the commerce of the Netherlands, the circumstances of the case made Germany the country of exportation.

In the *Hensel* case, *supra*, an importation of wallpaper, which had been manufactured in Germany, left the German factory, properly marked for Frederick Blank & Co. of New York, the importer; it was transported by motortruck to the Swiss border, where a deposit in lieu of duty was made and bond given, in return for which the Swiss officials issued a permit for transportation through Swiss territory, and thence to Hamburg, Germany, and shipped to the port of New York. The court found there was no evidence of any intention to divert the merchandise during its transit from the German factory.

In the *Mallinson* case, *supra*, certain merchandise, a product of French Indo-China, was shipped to Hong Kong and thence to the United States. Upon arrival in New York, the merchandise was appraised in Hong Kong currency, plus certain incidental expenses. The question before the court was whether Haiphong, in French Indo-China, or Hong Kong was the principal market for the merchandise. Upon the evidence before it, the court found that Haiphong was one of the principal markets for the merchandise in French Indo-China and that French Indo-China was the country of exportation.

In the *Meadows, Wye* case, *supra*, unbound sheets of dictionaries, printed partly in Italian and partly in English, were shipped by a manufacturer in Italy through an agent in London, England, for the purchaser in New York. It appears, from the opinion of the court in that case, that, upon its arrival in London, the merchandise was not packed "in the best manner." Accordingly, it was there repacked for shipment to the United States. Italy was held to be the country of exportation. The opinion of the court recites that—

\* \* \* the merchandise was purchased through D. Appleton & Co., of London, England, for the benefit of D. Appleton & Co., of New York; that D. Appleton

& Co., of England, did not have any interest in the merchandise, it acting for D. Appleton & Co., of New York. The manner of doing business was about as follows: D. Appleton & Co., of New York, would make an order for as many unbound sheets as they desired of the merchandise in question, and transmit such order to D. Appleton & Co., of London, for transmission by them to the manufacturer in Italy. When printed and ready for shipment these unbound sheets may be transmitted directly from Italy to the United States or transmitted to England for shipment by D. Appleton & Co., of London, to D. Appleton & Co., of New York. In payment thereof D. Appleton & Co., of New York, would issue its draft in English currency payable to the manufacturer in Italy and transmit it to D. Appleton & Co., of London, with instructions to forward the draft to the manufacturer in Italy. The draft is not deposited to the account of D. Appleton & Co. in London, but forwarded to Italy in the form in which it was issued in New York.

While the facts in the foregoing cases differ in certain details from the facts of the case at bar, the underlying principle of those cases finds appropriate application to the instant case.

As pointed out above, the syringes in controversy were manufactured in Japan and properly marked with the Hospitaline labels; it was stored in Canada as a matter of economy and convenience to Hospitaline; it was never sold or offered for sale in Canada, hence, it did not enter the commerce of Canada; and it was transported to New York, without manipulation or change in character in Canada.

In the light of the foregoing circumstances, the court is of the opinion that no sound legal reasons obtain for regarding Canada as the country of exportation. From the time the merchandise was ordered from the Japanese manufacturer by Gilbert & Co. to its delivery in New York, it was the intent of the parties involved to treat Japan as the country of exportation.

In view of the foregoing, the court is not disposed to create a legal fiction and treat Canada as the country of exportation.

The cases cited by the defendant, in its brief, have been examined, but, in the opinion of the court, are factually so dissimilar from the instant case as to be clearly distinguishable.

Upon the record before it, the court makes the following findings of fact:

1. The merchandise herein consists of hypodermic syringes and needles which were manufactured in and shipped from Japan to Gilbert & Co., Canada, who, in turn, shipped the merchandise to Hospitaline, Inc., the importer-plaintiff, in the United States.

2. J. R. Gilbert and Dr. William Bell are coowners of Gilbert & Co. of Toronto and Hospitaline, Inc., of New York, each being a half owner.

3. Gilbert & Co. of Toronto placed the order for the merchandise in issue with the manufacturer in Japan on behalf of Hospitaline, Inc., of New York.

4. The manufacturer in Japan placed the Hospitaline label on the merchandise in Japan. As a matter of convenience and economy, the merchandise was held temporarily in a warehouse of Gilbert & Co. in Canada to be shipped to Hospitaline at the latter's convenience.

5. That the merchandise *per se* was not manipulated, altered, or changed in any way while in Canada.

6. That none of said merchandise was sold or offered for sale in Canada.

7. That when the merchandise left Japan, it was intended for ultimate delivery in New York.

8. That Japan was the country of exportation.

9. That export value for such or similar merchandise, on the respective dates of exportation from Japan, is the proper statutory basis for appraising the merchandise, there being no higher statutory foreign value for such or similar merchandise.

10. That the invoiced and entered values for the merchandise are the statutory export values for such or similar merchandise, on the respective dates of exportation from Japan, including all costs, charges, and expenses for placing the merchandise in condition, packed ready for shipment to the United States.

The court concludes as matters of law:

1. That Japan was the country of exportation of the merchandise in controversy.

2. That the statutory export value, as that term is defined in section 402(d) of the Tariff Act of 1930 (19 U.S.C. § 1402(d)), is the proper basis for appraising such or similar merchandise, on the respective dates of exportation from Japan, including all costs, charges, and expenses in placing the merchandise in condition, packed ready for shipment to the United States, there being no higher statutory value for such or similar merchandise, and that said statutory export value is as stated in finding of fact number 10.

Judgment will issue accordingly.