(A.R.D. 156)

UNITED STATES *v.* HOSPITALINE, INC.

Entry No. 814940, etc.

Third Division, Appellate Term

(Decided May 6, 1963)

*John W. Douglas*, Assistant Attorney General (*Morris Braverman*, trial attorney), for the appellant.

*John D. Rode* (*Ellsworth F. Qualey* of counsel) for the appellee.

Before JOHNSON, DONLON, and RICHARDSON, Judges; DONLON, J., concurring

JOHNSON, Judge: This is an application for review of a decision and judgment of Judge Lawrence, holding that certain hypodermic syringes and needles, manufactured in Japan, shipped to Canada for storage, and then sent to the United States were subject to appraisement on the basis of the export value in Japan of such or similar merchandise, on the ground that Japan was the country of exportation. *Hospitaline, Inc.* v. *United States*, 48 Cust. Ct. 563, Reap. Dec. 10177.

The merchandise was appraised as an exportation from Canada on the basis of the foreign value of similar merchandise. It is this value that the Government contends for. The primary issue in the case, therefore, is whether Canada or Japan is the country of exportation.

It was stipulated at the trial that the merchandise was manufactured in Japan, imported into Canada by Gilbert & Co. of Toronto, and shipped to Hospitaline, Inc., of New York, an affiliated company, during the period from June 1, 1957, to March 1, 1958, without any change or alteration, but in the same condition as originally imported. It was further stipulated:

* * * that during the period when these shipments were made to the United States there was no export value or United States value for such or similar merchandise; that the sole question involved is the existence of a foreign value for such or similar merchandise for the period in question.

I also offer to stipulate that if the court finds that such or similar merchandise was freely offered for sale for home consumption in Canada to all purchasers during the period in question then the appraised values of the merchandise are correct and that they represent such home market value; that if the court finds that such or similar merchandise was not freely offered for sale for home consumption in Canada to all purchasers during the period in question then cost of production as defined in Section 402(a) (f) of the Tariff Act of 1930 as amended is the proper basis of appraisement and that such cost of production for the merchandise covered by each entry is the invoiced value.

I further offer to stipulate that if the court finds that Japan is the country of exportation to the United States for the merchandise here involved then the invoiced and entered values for the merchandise are the statutory export values for such or similar merchandise on the respective dates of exportation from Japan, including all costs, charges and expenses for placing the merchandise

in condition, packed ready for shipment to the United States, and that on the respective dates of exportation there was no higher statutory foreign value for such or similar merchandise.

Jules R. Gilbert, president of Gilbert & Co., testified as follows: There is no legal relationship between Gilbert & Co. and Hospitaline, Inc., but both companies are owned by the same major shareholders, Dr. William Bell and himself. The merchandise involved in this case was purchased in Japan through an agent from two manufacturers, Tsubasa Syringe Co. and Tohmon Manufacturing Co. It was purchased for Hospitaline, Inc., and at the time it was ordered in Japan, it was destined for New York. Merchandise of the same kind and quality was also purchased for Gilbert & Co. The needles and the syringes for Hospitaline, Inc., were labeled "Hospitaline, Inc.," and the merchandise for Gilbert & Co. was marked "Gilbert & Co." The latter was sold in Canada for home consumption, but the merchandise marked "Hospitaline, Inc.," was never at any time offered or sold in Canada. It was brought into Canada and kept there as a convenient way of storing it against the time it was needed, because such merchandise comes into Canada free of duty and because Gilbert & Co. had warehouse facilities in Canada, whereas Hospitaline's warehouse facilities in New York were very limited. It was not processed or manipulated in Canada in any way, except for relabeling for transportation to the United States and except where less than a shipping case was required, in which event, the merchandise was transferred to a carton, but the outer packaging of the syringes and needles was not disturbed. Gilbert & Co. billed Hospitaline, Inc., at actual cost, plus a separate service fee for handling, to cover the value of the money Gilbert & Co. had tied up in the merchandise and incidental charges, labor, storage, and shipping. Mr. Gilbert did not consider the transaction a sale, but a transfer of merchandise.

On cross-examination, Mr. Gilbert testified that he did not place orders with the Japanese supplier under the name of Hospitaline, Inc.; that Hospitaline, Inc., would place its own orders; that Gilbert & Co. could not place an order under the name of Hospitaline, Inc.; that the merchandise, regardless of how it was marked by the Japanese manufacturer and shipper, was for the account of Gilbert & Co. and was paid for by Gilbert & Co. However, the witness also stated that there was a contract between Hospitaline, Inc., and Gilbert & Co. with the Tsubasa Glass Co., the Japanese supplier, and that he was given the right by Tsubasa Glass Co. to purchase the Hospitaline merchandise. He stated also that Hospitaline, Inc., had the right to import certain syringes from Tsubasa Glass Co. into the United States, but, as a matter of convenience, it purchased from Gilbert & Co. in Canada where the merchandise was stored. Gilbert

& Co. shipped the merchandise to Hospitaline, Inc., and never directly to a customer of Hospitaline, Inc.

Gilbert & Co. had exclusive rights to distribute these products in Canada, but there were no restrictions on the sale thereof. Tsubasa Glass Co. had a distributor in the United States, not Hospitaline, Inc., but it is not clear from the record that it was an exclusive distributor.

Defendant introduced into evidence a report of Examiner George W. Arnold who visited the offices of Gilbert & Co. in Toronto on April 30, 1958, and interviewed Mr. Gilbert and Mr. D. L. Bennett, general manager. According to the report, Mr. Bennett stated that that there was an understanding by which Gilbert & Co. includes Hospitaline's requirements in its order to the Japanese manufacturer; that such merchandise was shipped to Toronto and retained in stock until required by Hospitaline, Inc.; that Gilbert & Co. will ship only to Hospitaline, Inc., except when Hospitaline, Inc., is out of stock, in which case, it will ship directly to the American purchaser, with Hospitaline, Inc., billing said purchaser. "All of the merchandise shipped to the United States is taken from stock, which was ordered for and destined for Hospitaline, Inc. * * * none of the stock ordered for Hospitaline Inc. entered the commerce of Canada." The examiner was also informed that the invoice prices were the laid-down costs of the merchandise in Toronto and did not include any profit for Gilbert & Co. According to Mr. Bennett, Gilbert & Co. would be unable to sell the "Hospitaline" brand in Canada, because the Canadian purchasers would believe it to be an inferior substitute for the "Gilbert" brand.

Under section 402 of the Tariff Act of 1930, both foreign and export values are to be determined on the basis of the prices at which the merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported. A first requisite in determining dutiable value, therefore, is to find the country of exportation. This question has arisen in a number of cases where merchandise is manufactured in one country but shipped to the United States from another.

The classic statement of the rule is found in *United States* v. *G. W. Sheldon & Co. (Damon Raike & Co.)*, 53 Treas. Dec. 34, 36, T.D. 42541, where the court said:

Merchandise imported from one country, being the growth, production, or manufacture of another country, must be appraised at its value in the principal markets of the country from which immediately imported, unless it is shown that it was destined for the United States at the time of original shipment without any contingency of diversion.

In that case, the merchandise was sent to Canada from Germany for the purpose of sale, but when no market was found there, it was shipped to the United States. The court found that there was an

intention of withdrawing it for consumption in Canada and that part of it was so withdrawn. It was, therefore, held that there was a contingency of diverting all the merchandise for consumption in Canada.

In *United States* v. *Meadows, Wye & Co.* (*Inc.*), 49 Treas. Dec. 959, T.D. 41622, affirmed without opinion, 14 Ct. Cust. Appls. 488, merchandise was ordered from Italy through plaintiff's affiliate, D. Appleton & Co. of London, and was shipped directly to New York or transmitted to England for shipment by D. Appleton of London to New York. Payment was by draft transmitted to D. Appleton of London and forwarded by it to Italy. The merchandise was repacked in London for shipment to New York and a new invoice made out. The court held that Italy was the country of exportation, on the ground that the merchandise did not enter the commerce of England. The court said (p. 967) :

We therefore feel that the facts fully warrant the conclusions : That the merchandise was purchased in Italy at the invoice price ; that it was shipped therefrom through London, England ; that its repacking in England did not cause it to enter into the commerce thereof; and that D. Appleton & Co. of London, England, were not the owners or sellers of the merchandise.

In *United States* v. *F. W. Hagemann*, 39 CCPA 182, C.A.D. 484, a chemical known as Liquitol was manufactured in Germany, shipped to N. V. Internationale Compagnie of Holland, the exporting agent for the German manufacturer, and sold by it to the importer. It was held that Germany was the country of exportation, the court stating (p. 185) :

* * * In an affidavit of a director and manager of the Dutch company it is stated that the merchandise made in Germany was destined at the time it left that country to the Alpha Lux Company, Inc. ; that the goods did not enter the trade or commerce of The Netherlands; that it had not been processed or treated in any manner there, but was exported from Rotterdam in the same condition and state that it left Germany.

See also *H. S. Dorf & Co., Inc., a/c Joseph H. Meyer Bros.* v. *United States*, 41 CCPA 183, C.A.D. 548, where merchandise was manufactured in France, shipped to New York, transshipped to Mexico, and returned to New York, without having been entered in Mexico for consumption or appraisement. Although the state of the record compelled an affirmance of the decison of the appellate division sustaining the appraisement, the court pointed out that the valuation based upon a Mexican cost of production, as assessed by the appraiser, was predicated upon a wrong theory of law, since the rods never entered into the commerce of that country.

Defendant states that, in all of these cases, the manufacturer and shipper in the foreign countries knew that the merchandise was destined for the United States; that, in the instant case, the Japanese manufacturer did not have this information; and that, therefore, this

case does not fall within the principle of the *G. W. Sheldon Co.* case, *supra.*

This question was before Chief Judge Oliver in a recent case, *T. M. Duche & Sons, Inc., et al.* v. *United States,* 49 Cust. Ct. 377, Reap. Dec. 10325. The merchandise involved was produced in Morocco by a firm referred to as SEPROC. Because there had been a rupture in commercial relations between plaintiffs and SEPROC, orders were placed through plaintiffs' English affiliate. The merchandise was shipped from Morocco to England, where it was transshipped in its original containers, without being processed, manipulated, manufactured, or altered, and without the payment of British customs duties, to vessels bound for the United States. Plaintiffs reimbursed the English affiliate in an amount representing the actual costs, that is, the purchase price, cost of transporting the merchandise from Morocco to England, and cost of transshipment. In connection with the claim that the merchandise could not be considered an exportation from Morocco because SEPROC did not intend to ship it to the United States, the court said:

> There is no indication in the case at bar that SEPROC did *not* intend that the merchandise should ultimately be shipped to the United States. Apparently, it believed that the transactions with Duché U.K. were for exportation of agar agar to the United Kingdom, but it would also appear that the ultimate destination was a matter of indifference to it, since, under the stipulated facts, such or similar merchandise was also freely sold or offered for sale for exportation to the United States.
>
> Furthermore, it clearly appears that at all times, from the purchase of the merchandise from SEPROC until its importation into the United States, it was the intention of Duché U.K. and the plaintiffs that the United States was to be the destination of the merchandise.

A reading of the cases on the subject of country of exportation indicates that the determining factors are that the merchandise be destined for the United States at the time of original shipment without any contingency of diversion and that it not enter the commerce of the intermediate country.

While the record herein is somewhat confused as to whether or not orders could be placed by Hospitaline, Inc., or in its name with the Japanese manufacturers, it is clear that there was an arrangement between Hospitaline, Inc., and Gilbert & Co. whereby Gilbert & Co. was to place orders for it with the Japanese manufacturers. Such merchandise was marked with the name "Hospitaline" and was destined by both Gilbert & Co. and Hospitaline, Inc., for ultimate delivery in the United States. It was not offered for sale in Canada and did not enter the commerce of that country; it was merely stored there. It was not manipulated in Canada, except for relabeling and, in some cases, repacking. Gilbert & Co. charged Hospitaline, Inc., for the cost of the merchandise and its expenses but did not make a profit on

the transaction and did not consider it a sale. There is no evidence that Gilbert & Co. at any time offered or sold or delivered the Hospitaline merchandise to anyone other than Hospitaline, Inc., or possibly its customers.

According to the record, the reason for this method of handling the merchandise was for convenience, since Gilbert & Co. had storage facilities and Hospitaline, Inc., did not. While defendant claims that the arrangement was one of necessity, on the ground that Hospitaline, Inc., could not have purchased the goods in any other manner, this is not established by the record. There is at least one statement to the effect that Hospitaline, Inc., could have purchased directly from the Japanese manufacturer. While there is evidence that the manufacturers had a distributor in the United States, it is not clear that it was an exclusive distributor nor that the manufacturers could not have sold directly to American customers. It seems evident that the arrangement was a convenient one for Hospitaline, Inc., because of its own lack of storage facilities, and no doubt was financially advantageous, particularly in view of the fact that Gilbert & Co. and Hospitaline, Inc., were owned by the same persons. Whatever the reasons for the arrangement, the merchandise was, in fact, stored in Canada and was not offered for sale in that country but was held in stock against requisitions by Hospitaline, Inc.

According to the record, there was an agreement between Hospitaline, Inc., and the Tsubasa Glass Co. for the sale of certain types of syringes in the United States. Thus, at least one of the Japanese manufacturers involved must have known that Hospitaline, Inc., was a New York corporation from which it can be assumed that it realized that merchandise marked "Hospitaline" was destined for New York. There is nothing in the record to indicate that the Japanese manufacturers did not intend that the merchandise be destined for the United States. As in the *Duche* case, it would appear that the ultimate destination of the merchandise was a matter of indifference to it. It was the intention of Gilbert & Co. and Hospitaline, Inc., at the time of the original order, that the United States be the destination of the merchandise, and there was no contingency of diversion since the merchandise was marked "Hospitaline" and merchandise so marked was not sold in Canada.

Accordingly, Japan is the country of exportation and the merchandise is subject to appraisement on the basis of the export value for such or similar merchandise on the respective dates of exportation from Japan.

We find as facts:

1. That the merchandise herein consists of hypodermic syringes and needles which were manufactured in and shipped from Japan to

Gilbert & Co. of Toronto, Canada, who, in turn, shipped the merchandise to Hospitaline, Inc., of New York.

2. That Gilbert & Co. of Toronto and Hospitaline, Inc., of New York are owned by the same major shareholders, Dr. William Bell and J. R. Gilbert.

3. That Gilbert & Co. of Toronto placed the order for the merchandise in issue with the manufacturers in Japan for Hospitaline, Inc.

4. That the needles and the syringes for Hospitaline, Inc., were labeled "Hospitaline, Inc.," by the manufacturers in Japan.

5. That the merchandise for Hospitaline, Inc., was brought into Canada and stored there against Hospitaline's requirements, because Gilbert & Co. had warehouse facilities in Canada, whereas Hospitaline's warehouse facilities in New York were very limited.

6. That the merchandise *per se* was not manipulated, altered, or changed in any way while in Canada.

7. That merchandise, marked "Hospitaline, Inc.," was not sold or offered for sale in Canada.

8. That, at the time the merchandise was ordered in Japan, it was intended for ultimate delivery in New York.

9. That, on the respective dates on which the merchandise was exported from Japan, the price at which it was freely offered for sale to all purchasers in the principal markets of Japan, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, including all costs, charges, and expenses for placing the merchandise in condition, packed ready for shipment to the United States, is represented by the respective invoiced and entered values.

10. That there was no higher foreign value for such or similar merchandise in Japan.

We conclude as matters of law:

1. That Japan is the country of exportation of the merchandise involved herein.

2. That the export value, as that value is defined in section 402(d) of the Tariff Act of 1930, is the proper basis for the determination of the value of the merchandise involved herein.

3. That said value is represented by the respective invoiced and entered values.

The decision and judgment of the trial court are affirmed, and judgment will be rendered accordingly.

CONCURRING OPINION

DONLON, Judge: I arrive at the same result as my colleagues. However, I desire to disassociate myself from so much of the principal opinion as might give significant probative value to evidence

that there was a mutual understanding between Gilbert & Co., in Canada, and Hospitaline, Inc., in the United States, that certain orders for this merchandise placed by Gilbert in Japan were agreed by them as destined for the United States.

The basis of appraisement is export value. That, obviously, relates to value predicated on sales or offers for sale, by an exporter in Japan for export to the United States. The test of such value requires some proof of sales, or offers, by a seller in Japan for export to the United States. What the buyer knew, or intended, is not primary evidence of what was in the seller's mind.

Chief Judge Oliver, in the *Duche* case, cited in the principal opinion, pointed out that the record there showed "such or similar merchandise was also freely sold or offered for sale [in Morocco] for exportation to the United States." The intention of the British and American parties relative to their purchases appears to be an ancillary, rather than the chief, ground of the *Duche* decision.

Here, likewise, we have unrebutted proofs, albeit slight, that similar merchandise, if not such merchandise, was sold in Japan for export to the United States. This proof, buttressed by the course of events relative to the involved merchandise, brings us within the rationale of the *Duche* decision as to country of export, and the parties have stipulated what the amount of the Japanese export value is.

For the reasons stated, I join my colleagues in affirming the decision below.