(C.D. 3911)

MORESCO CORP. *v.* UNITED STATES

United States Customs Court, First Division

(Decided October 31, 1969)

*Siegel, Mandell & Davidson* (*Harvey A. Isaacs* and *Joseph Kaplan* of counsel) for the plaintiff.

*William D. Ruckelshaus*, Assistant Attorney General (*Brian Goldstein* and *Andrew P. Vance*, trial attorneys), for the defendant.

Before WATSON, MALETZ, and RE, Judges

WATSON, Judge: This protest involves the importation of certain trichloroethylene which the collector classified at the full statutory rate of duty of 30 per centum ad valorem under paragraph 18 of the Tariff Act of 1930, as modified by Presidential proclamation T.D. 52788. The assessment was apparently made by virtue of a determination by the collector that the merchandise in question was a product of East

Germany within the meaning of Presidential proclamation, T.D. 52788.

Plaintiff, though conceding the merchandise is trichloroethylene properly classifiable under paragraph 18 of the Tariff Act of 1930, as modified, contends that the involved merchandise by virtue of the addition of certain chemicals in West Germany, had become a product of West Germany, and therefore dutiable at the rate of 7½ per centum ad valorem under said paragraph 18 of the tariff act, as modified by T.D. 52739.

The pertinent parts of the statutes and the Presidential proclamation are:

Paragraph 18 of the Tariff Act of 1930:

> Carbon tetrachloride, * * * tetrachloroethan, and trichloroethylene, 30 per centum ad valorem.

Paragraph 18 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739:

> Trichloroethylene _____ 7½% ad val.

Presidential proclamation, T.D. 52788:

> WHEREAS sections 5 and 11 of the Trade Agreements Extension Act of 1951 (Public Law 50, 82d Congress) provide as follows:
>
> SEC. 5.  As soon as practicable, the President shall take such action as is necessary to suspend, withdraw or prevent the application of any reduction in any rate of duty, or binding of any existing customs or excise treatment, or other concession contained in any trade agreement entered into under authority of section 350 of the Tariff Act of 1930, as amended and extended, to imports from the Union of Soviet Socialist Republics and to imports from any nation or area dominated or controlled by the foreign government or foreign organization controlling the world Communist movement.
>
> SEC. 11.  The President shall, as soon as practicable, take such measures as may be necessary to prevent the importation of ermine, fox, kolinsky, marten, mink, muskrat, and weasel furs and skins, dressed or undressed, which are the product of the Union of Soviet Socialist Republics or of Communist China.
>
> *       *       *       *       *       *       *
>
> Now, THEREFORE, I, HARRY S. TRUMAN, President of the United States of America, * * * do proclaim:

### PART I

That the application of reduced rates of duty * * * established pursuant to trade agreements * * * shall be suspended with respect to imports from such nations and areas referred to in section 5 as may be specified in any notification pursuant to this part of this proclamation given by the President to the Secretary of the Treasury, * * *. *For the purposes of this part the term "imports from such nations and areas" shall mean articles imported directly*

*or indirectly into the United States from nations or areas specified in an effective notification,* but shall not in any case include articles the growth, produce, or manufacture of any other nation or area. [Italics ours.]

The matter herein was submitted upon an agreed stipulation of fact and the testimony of two witnesses called by the plaintiff.

At the outset of the trial, counsel for the respective parties stipulated as follows:

> First, that the merchandise, the subject of the protest, consists of stabilized Trichlorethylene [sic], imported under Entry 866342 of 12/4/59; secondly, that the Trichlorethylene [sic] was produced in East Germany and thereafter shipped to West Germany, where materials in the following per gallon percentages were added: (a) 0.13 per cent pyridine; (b) 0.02 per cent triethylamine; and, (c), 0.03 per cent pine oil (steamed distilled). [R. 3–4.]

Plaintiff's first witness was Mr. Melville Morris, formerly the president of Moresco Corporation, engaged in the importation and sale of chemicals in the United States (R. 10). Mr. Morris testified that he had personally negotiated the contract for the purchase of the involved merchandise with Rotexchemie Brunst in Hamburg, Germany (R. 11), and that he was familiar with the arrangements for the shipments of the goods from East Germany to the Deutsche Fanto plants in West Germany. The witness stated that, after importation, he was responsible for the sale of this merchandise to various industrial customers all over the United States, and that he was familiar, through personal observation, with the use to which the merchandise was put (R. 12–13).

As explained by plaintiff's witness, trichloroethylene is a liquid solvent used in the industrial process of cleaning metal parts during the process of manufacture. The solvent is placed into a tank or a vat and is then heated to a temperature of 184.6 degrees, at which time it vaporizes and rises up within the tanks and different equipment in which it is used. The metal parts are then introduced into the vapor, and the vapor condenses on the colder metal parts and takes away with it all the grease and soil and other contaminates and "washes it down to the bottom." This process is known as metal cleaning or degreasing (R. 14–15).

Plaintiff's second witness was Mr. Ephraim Werner, a chemical engineer and presently the president of Phillips Manufacturing Company, manufacturer of metal cleaning and vapor degreasing equipment, which company also distributes the chemicals that are used with this equipment. Mr. Werner testified that in the course of his experience he had personally observed the use of trichloroethylene. He testified that the materials stipulated as being added to the trichloro-

ethylene, 0.13 percent pyridine, 0.02 percent triethylamine, and 0.03 percent pine oil, were added in order to stabilize the product (R. 32) ; that trichloroethylene, in its pure state, is not very stable, and tends to become acid quickly, especially on contact with air, in which event it would tend to oxidize. The witness then testified that the introduction of stabilizers into the trichloroethylene tends to neutralize any acid that might form, and tends to prevent the formation of acid in trichloroethylene (R. 32). He stated that, to the best of his knowledge, "unstabilized" trichloroethylene, i.e., without the addition of stabilizers, is not marketed in the United States and that unstabilized trichloroethylene would tend to turn to acid within 48 hours if exposed to air (R. 33–35). The witness stated that, in the past, it has been necessary to further stabilize trichloroethylene where the material did not meet specifications in terms of acid acceptance (R. 37–38). He testified that his company does not buy any "pure" trichloroethylene (R. 38), and that even with stabilized material you have to do additional stabilizing (R. 39). Plaintiff's witness further stated that to the best of his knowledge the product, without the addition of a stabilizer, cannot be used as a metal degreasing solvent because of its tendency to "go acid" very quickly (R. 40).

On cross-examination, Mr. Werner testified that, based upon his knowledge and experience, a material such as thymol would normally be added as soon as the trichloroethylene is distilled in order to inhibit oxidation and to facilitate handling; that, in some instances, the addition of an inhibitor will slow down the oxidation process for a couple of months and the merchandise can be shipped in that condition (R. 48).

Mr. Werner further testified that when the pyridine, triethylamine and pine oil are added to the trichloroethylene, no new compound is formed, but rather these three substances go into solution with the trichloroethylene (R. 49–50). The addition of the stabilizers causes the solution to become alkaline and increases its acid absorption capacity (R. 56, 60). Plaintiff's witness, when asked if he was familiar with the term "phenolstabilization", stated that he was not familiar with this stabilization system, although he was "aware of it". In this connection, Mr. Werner stated:

> All I can say is that there are a number of different stabilization systems in the United States. They are all kept relatively secret, and most of them are patented, to one degree or another, and I wouldn't want to venture my knowledge of anyone else's patents or use of a stabilization system. *They all perform the same job*, in that they are to act as a material for acid absorption and neutralization of acid. [Emphasis supplied.] [R. 60–61.]

Plaintiff's witness stated that while the process known as phenol-stabilization was a different type of stabilization from that here discussed, he assumed it was "for the same ultimate purpose" (R. 62).

Defendant's exhibit A is a copy of the contract for the purchase of the trichloroethylene in issue. The parties to said contract are Moresco Corporation of New York and Rotexchemie Brunst and Company, Hamburg, Germany. The contract was signed by Mr. Morris of Moresco Corporation. This contract required the trichloroethylene, to be delivered from Soviet East Germany to West Germany, to have been already "phenolstabilized" (R. 68). Mr. Morris, upon being recalled to the stand, testified as follows:

> Q. With respect to the term of this contract, sir, I point your attention to the designated article "Trichlorethylene [sic], quality as already delivered, *phenolstabilized* and according to the follow-average analysis * * *"
> [Emphasis added.]
> Are you familiar with these terms?—A. Yes, sir.

Plaintiff's witness, as heretofore noted, testified with respect to the stabilization systems used, that "They all perform the same job", namely, as a material for acid absorption and neutralization of acid. In our opinion, defendant's exhibit A, the contract for the purchase of the trichloroethylene, conclusively indicates that what was imported into West Germany from East Germany was stabilized trichloroethylene.

It is axiomatic in customs jurisprudence that the collector is presumed to have found every fact to exist that was necessary to sustain the Government's classification, and that the classification is correct. *United States* v. *Marshall Field & Co.*, 17 CCPA 1, T.D. 43309. It is also well settled that a plaintiff has the two-fold burden of establishing (1) that the collector's classification is erroneous, and (2) that the claimed classification is correct. *Bob Stone Cordage Co.* v. *United States*, 51 CCPA 60, C.A.D. 838 (1964) ; *Schlumberger Well Surveying Corp.* v. *United States*, 54 CCPA 37, C.A.D. 901 (1967). Failure on the part of the plaintiff in either of the above burdens requires the protest to be overruled.

In support of its contention that the imported merchandise, by virtue of the addition of the chemicals in West Germany, is a product of West Germany and that, accordingly, it is entitled to the reduced rate of duty of 7½ per centum ad valorem as provided for in paragraph 18 of the Tariff Act of 1930, as modified by the Torquay protocol, *supra*, plaintiff directs our attention to the holding of this court in the cases of *Chemo Puro Mfg. Corp.* v. *United States*, 34 Cust. Ct. 8, C.D.

1668 (1954), and *F.W. Myers & Co., Inc.* v. *United States*, 36 Cust. Ct. 5, C.D. 1745 (1955). The court in the above-cited cases held that certain merchandise shipped from one country through another was an importation from the latter. The factual situations presented in those cases, however, differed, in our opinion, from that present in the case at bar.

In the *Chemo Puro Mfg.* case, *supra*, certain tannic acid, produced in the United Kingdom from nutgalls of Chinese origin was held an article, the growth, produce or manufacture of the United Kingdom, and not of Communist China. In its decision, the court, pages 11–12, said:

> * * * The identity of the nutgalls, produced in China, has been lost, and a *new product with a new name, a new use and a distinct tariff status* has been produced in the United Kingdom, the country of exportation. * * * [Emphasis added.]

In the case at bar, the imported trichloroethylene exported from West Germany, is not a new product with a new name, nor a new use, and does not possess a distinct tariff status.

In the case of *F.W. Myers Co.*, *supra*, the importation in question was an advanced natural and uncompounded, nonedible drug, manufactured in Canada from a crude drug originally shipped from China to England, and then to Canada where it was processed into an advanced drug, differing in character from the original exportation from China. The court in holding the merchandise in question to be of Canadian origin and not an importation from Communist China (at page 6) stated:

> In the instant case, certain raw materials, originating in China, *were processed into an entirely new product* in Canada. The importation was, therefore, not of Chinese Communist, but of Canadian origin. [Emphasis added.]

In the case at bar, however, the phenolstabilized trichloroethylene imported from East Germany, was not "processed into an entirely new product" in West Germany, a factor distinguishing it from the cases cited by the plaintiff.

It is well settled that an article shipped from one country through another, without entering the commerce of the latter, is an importation from the former, *Dulien Steel Products, Inc., of Calif. and W. J. Byrnes & Co., Inc.* v. *United States*, 35 Cust. Ct. 339, Abstract 59548 (1955).

Both parties to this controversy also direct our attention in their respective briefs to the holding of the court in *United States* v. *Hercules Antiques, The Danwill Company*, 44 CCPA 209, C.A.D. 662 (1957). There, the involved merchandise was purchased in Holland by the importer's representative and shipped to the United States

from that country. The goods were not manufactured in Holland but appeared to have originated in Czechoslovakia, a so-called Iron Curtain Country, dominated by Soviet Russia. In upholding the collector's finding that the merchandise was imported from Czechoslovakia, the court in its decision, pages 212–213, stated:

> It would be difficult, if not impossible, to define exact standards for determining the duration of stay of merchandise in an intermediate country, the nature of the transactions to which it is subjected there, and other circumstances necessary to divest it of its status as an import, direct or indirect, from the Communist-dominated country in which it originated. *However, we are of the opinion it must be established by appropriate evidence that the merchandise has actually become a bona fide part of the commerce of the intermediate country. That responsibility * * * of course, rests upon the importer * * *.*

> If the goods of such countries could be imported into the United States at reduced rates of duty merely because (instead of being brought in directly) they were purchased from dealers in other countries, it seems clear that such dealers could well make a practice of buying goods of that type with a view to reselling them to American importers. It is equally clear that such a practice would increase the commerce of the Communist-dominated country in which the goods were produced and would thus inure to the benefit of that country. Whether the sale in the intermediate country was made privately or in the open market, by auction or otherwise, is not, of and by itself, controlling. The ultimate effect of such sales, however made, would be to permit the goods of Communist-dominated countries to reach the American market at a reduced rate of duty, and thus to compete on more favorable terms with the goods of countries which are not so dominated.

> In our opinion a holding that the fact that the goods of a Communist-dominated country were merely purchased in another country was sufficient to permit them to be imported into the United States at reduced rates of duty would defeat the clear purpose of the Presidential proclamation, since it would permit the Communist-dominated countries to obtain the benefit of the reduced rates merely by dealing through agents in other countries. Even assuming that, for some purposes, goods which are made in one country and sold in the open market of another before they are imported into the United States are to be considered an import from the latter country, we do not think that such a view can be taken in the instant situation. *We are dealing here with a specific proclamation designed to accomplish a definite purpose. Under such circumstances it is clearly our duty to supply the interpretation which will best give effect to the intent of the proclamation.* [Emphasis added.]

In *Hospitaline, Inc.* v. *United States*, 48 Cust. Ct. 563, R.D. 10177 (1962), certain hypodermic syringes and needles, manufactured in Japan and shipped through Canada to the United States, were ap-

praised as an exportation from Canada. The court held, upon the evidence of record, that Japan was the country of exportation, stating (at page 568), as follows:

> As pointed out above, the syringes in controversy were manufactured in Japan and properly marked with the Hospitaline labels; it was stored in Canada as a matter of economy and convenience to Hospitaline; *it was never sold or offered for sale in Canada, hence, it did not enter the commerce of Canada; and it was transported to New York, without manipulation or change in character in Canada.*
>
> In the light of the foregoing circumstances, the court is of the opinion that no sound legal reasons obtain for regarding Canada as the country of exportation. From the time the merchandise was ordered from the Japanese manufacturer by Gilbert & Co. to its delivery in New York, *it was the intent of the parties involved to treat Japan as the country of exportation.*
>
> In view of the foregoing, the court is not disposed to create a legal fiction and treat Canada as the country of exportation. [Emphasis added.]

Similarly, in the case at bar, there is no showing that the imported trichloroethylene was ever sold or offered for sale in West Germany. It further appears that since it arrived in West Germany in a stabilized state, it was transported to the United States without any change in character in West Germany. The addition of more stabilizers in West Germany cannot be considered a process of manufacture so as to constitute the trichloroethylene a product of West Germany. In our opinion, the record herein warrants a finding that the merchandise here in question had not actually become a *bona fide* part of the commerce of West Germany so as to entitle it to the reduced rate of duty claimed by the plaintiff.

For the reasons heretofore stated, we are of opinion and hold that the involved trichloroethylene was a product of Soviet East Germany and, accordingly, properly classifiable under paragraph 18 of the Tariff Act of 1930, as modified, at the rate of 30 per centum ad valorem. The protest is overruled. Judgment will issue accordingly.