CARDINAL GLOVE CO., INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 82-4-00501

Before BOE, *Judge.*

(Decided July 22, 1982)

*Sharretts, Paley, Carter & Blauvelt, P.C. (Gail T. Cumins, Ned H. Marshak* and *Peter Jay Baskin* on the briefs), for the plaintiff.

*J. Paul McGrath,* Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, (*Susan Handler-Menahem* on the brief) for the defendant.

BOE, *Judge:* In the above-entitled action the subject merchandise, cotton gloves assembled in Haiti from "panels" manufactured in Hong Kong, has been denied entry into the United States by the Customs Service because of the lack of an export license and/or visa as required by the bilateral textile agreement between Hong Kong and the United States.

The parties have submitted this action to the court for determination upon a stipulation of facts which provide:

1. This court has jurisdiction over this Civil Action pursuant to 28 U.S.C. § 1581(a).

2. The merchandise the subject of this Civil Action consists of cotton gloves, properly classifiable in item 704.45, Tariff Schedules of the United States (TSUS), as 'gloves not of lace or net and not ornamented, and glove linings, of vegetable fibers, made from a pre-existing machine-knit or woven fabric, not woven.'

3. The accompanying sample of the imported merchandise, a finished glove, Exhibit A, is representative of the merchandise in its condition as plaintiff sought to make entry into the United States.

4. The accompanying sample of the front and back panel of the glove, Exhibit B, is representative of the imported merchandise in its condition as exported from Hong Kong to Haiti.

[11] In view of the Court's finding that the dismissals were not in accordance with the law it does not reach plaintiffs' argument that they were also tainted by impermissible *ex parte* communications.

5. The cotton fabric from which the imported gloves were manufactured was produced in Hong Kong.

6. This fabric was cut in Hong Kong into front and back panels.

7. The front and back panels were shipped from Hong Kong to Haiti.

8. The front and back panels were assembled in Haiti by being sewn together with thread manufactured in the United States.

9. The gloves were then turned inside out, pressed, inspected, paired, folded and bundled in Haiti.

10. The gloves were shipped from Haiti to the United States.

11. At the time the glove panels were exported from Hong Kong, the plaintiff intended that the gloves assembled in Haiti from the glove panels would be imported into the United States.

12. The assembly of the glove panels was the only procedure for which the glove panels went to Haiti.

13. The gloves were never sold or offered for sale for consumption in Haiti.

14. The merchandise such as Exhibit B is sold in the United States glove trade as unassembled gloves, tranks or panels.

15. The Customs Service decision to deny entry of these gloves was because the entry was not accompanied by a Hong Kong export license.

16. The Customs Service decision to deny entry was based on a determination that the merchandise in issue was subject to a bilateral textile agreement between the United States and Hong Kong.

The current bilateral textile agreement (agreement) between the United States and Hong Kong states at paragraph 4:

> During the term of the Agreement, the Government of Hong Kong shall limit annual exports from Hong Kong of cotton, wool, and man-made fiber textiles and textile products of Hong Kong origin to the United States of America, to the Aggregate, Group, Specified Limits and Sub-Limits set forth in Annex A hereto, as such limits may be adjusted in accordance with paragraphs 5, 6 and 7 * * *

The defendant contends that the subject merchandise, having been cut into component parts in Hong Kong from cotton fabric produced in Hong Kong and shipped after processing in an intermediate country (Haiti) to the United States, is subject to the foregoing agreement and must be accompanied by a license and/or visa from Hong Kong in order to be permitted entry into the United States.[1]

---

[1] Annex D to the agreement describes the establishment of the "visa mechanism" as an "administrative arrangement."

The plaintiff, however, contends that the subject merchandise, because of its assembly and processing in Haiti, is an export from Haiti for the purpose of our tariff laws and, accordingly, not subject to the agreement and the licensing provisions contained therein between Hong Kong and the United States.

Various descriptive terms are used in the agreement referring to the products and materials which, upon exportation from Hong Kong to the United States, are subject to limitation and licensing requirements.[2] However, in considering the applicability of the provisions of the agreement to the instant action, the initial and basic question which must be addressed is whether the merchandise *in issue* presently seeking entry into the United States has been, in fact, "exported from Hong Kong to the United States." Only if the merchandise in issue has been exported from Hong Kong does the question of its origin become material with respect to the application of the agreement and its licensing provisions.

The hypothetical discussion contained in the respective memorandum briefs of counsel, as to how the merchandise in its form and condition when shipped from Hong Kong would be classified, is not relevant to the instant action. In the authorities cited by the defendant—*Doherty-Barrow of Texas, Inc.* v. *United States,* 3 CIT 228 (1982); *Daisey-Heddon* v. *United States,* 66 CCPA 97, 600 F.2d 799 (1979); *Jack Bryan, Inc.* v. *United States,* 72 Cust. Ct. 197, C.D. 4541 (1974)—the issue before the court was whether the imported merchandise under Interpretative Rule 10(h), TSUS, should be properly classified as unfinished articles. Exportation of the respective merchandise therein had been made directly from Country A to the United States. No intermediate country in which processing, alteration or any change in the merchandise occurred was involved.

In the instant action the subject merchandise seeking entry into the United States consists of "gloves," properly classifiable under item 704.45, TSUS, (Stipulation of fact No. 2). No argument exists as to the finished character thereof nor with respect to the application of Interpretative Rule 10(h), TSUS. On the contrary, the sole issue presented in the instant action is a determination of the country from which the present merchandise in issue was exported.

To interpret the intent of the bilateral agreement in the manner urged by the defendant would place a grossly unfair burden upon Hong Kong. Defendant's interpretation, carried to a logical conclusion, would require that a jacket, manufactured in France from a bolt of cloth produced in and exported from Hong Kong, be accompanied by a Hong Kong visa or license, if the intention existed that the jacket be exported to the United States. Suffice it to say, the exportation of merchandise from a country producing a product to an intermediate country for the purpose of processing, manipulat-

---

[2] In the agreement the applicable textiles are referred to as "of Hong Kong origin," "produced in Hong Kong," and "manufactured in Hong Kong."

ing or assembling that product, is a common practice in our present day industrial and technological economy. Accordingly, in ascertaining the intent of the agreement, the language therein referring to "exports from Hong Kong" must be given a construction consistent with the interpretation given to similar language in the ascertainment of the "country of exportation" in the administration of our tariff laws.

In the absence of specific statutory or regulatory authority to the contrary, therefore, the court shall adhere to the rationale and the standards adopted by prior court and customs decisions in ascertaining the country of exportation for purposes of appraising the value of imported merchandise under the Tariff Schedules of the United States.

It may be stated as a general proposition of Customs law that "[m]erchandise imported from one country, being the growth, production, or manufacture of another country, must be appraised at its value in the principal markets of the country from which immediately imported * * * " *United States* v. *G. W. Sheldon & Co.,* 53 Tress. Dec. 34, T.D. 42541 (1928). However, an intermediate country ceases to be considered the country of exportation, and the country of origin is looked upon as the country of exportation, if from the facts under determination it appears that the following tests have been met:

1. No part of the merchandise was intended for diversion into the commerce of the intermediate country;

2. None of the goods were, in fact, diverted into the commerce of the intermediate country;

3. A contingency of diversion did not exist; and,

4. None of the merchandise was in any way treated, processed, altered, manipulated or changed in character in the intermediate country.

*Hospitaline, Inc.* v. *United States,* 48 Cust. Ct. 563 (1962), *aff'd* 50 Cust. Ct. 556 (1963); *United States* v. *F. W. Hagemann,* 39 CCPA 182 (1952); Customs Service Decision 79-186, 13 C.S.D. 1253 (1979); *Tower & Sons* v. *United States,* 67 Treas. Dec. 1358 (1935).

From the stipulated facts it is clear that none of the merchandise was sold, or offered for sale, into the commerce of the intermediate country, Haiti. Plaintiff's intent from the beginning was to ship glove panels from Hong Kong to Haiti where they would be processed into gloves, and then shipped to the United States. There is no evidence in the record whether or not a contingency of diversion existed. The intent of the plaintiff to export the goods to the United States, as well as the stipulated facts indicate no reasonable possibility that the gloves could have been sold or offered for sale in Haiti, or elsewhere. *United States* v. *G. W. Sheldon & Co.,* 53 Treas. Dec. 34, 36 (1928); *Hospitaline, supra; T. M. Duche & Sons* v. *United States,* 49 Cust. Ct. 377 (1962).

In the opinion of the court, however, the stipulation of facts as well as an examination of Exhibits A and B [3] establish that the merchanise in issue has been assembled and processed in Haiti to an extent as to cause the cotton panels manufactured in Hong Kong to be substantially transformed into their present form.

For an intermediate country to be eliminated as the country of exportation the merchandise must not have been manipulated, treated or processed therein. Manipulation and processing of the merchandise requires more than relabeling or repacking. *Hospitaline, supra. United States* v. *Meadows, Wye & Co.,* 49 Treas. Dec. 959, T.D. 41662 (1926). In *Hospitaline,* where syringes manufactured in Japan were warehoused in Canada "as a matter of economy and convenience" but "without manipulation or change in character," the court held Japan to be the country of exportation. In *F. W. Hagemann* v. *United States,* 24 Cust. Ct. 587, *aff'd* 39 CCPA 182, (1952), the court, in holding that chemical compounds exported from Germany to the Netherlands and thence to the United States were exports from Germany, indicated that had the Dutch exporter been able to demonstrate that he had treated the compounds with additional chemicals, the product would have been deemed to have been exported from the Netherlands for U.S. appraisal purposes. In Customs Service Decision 79–186, *supra,* customs decided that the further treatment in Canada of hats imported from Korea, by causing patches to be heat-sealed onto the caps, sufficiently altered the merchandise to make it a product of Canada. The customs service likewise has held that sweaters assembled in Hong Kong from parts produced in Taiwan were products of Hong Kong for tariff purposes. Customs Service Decision 80–10, 14 Cust. Bull. 740 (1980). Citing *Anheuser-Busch,* 207 U.S. 556 (1907), customs found that the assembly of sweaters in Hong Kong had created a "new and different article" for tariff purposes, even though the unassembled parts would have had the same classification as the finished articles if imported into the United States altogether. 14 Cust. Bull. at 741. *See Dolliff & Co.* v. *United States,* 81 Cust. Ct. 1 (1978).

In the case at bar, the court observes that substantial processing steps have been undergone in Haiti, transforming previously unrecognizable strips of cotton cloth into cotton work gloves. These steps include: pairing of the appropriate panels, sewing the respective panels so as to form a glove into which the hand and fingers may be inserted, inversing, pressing, folding, inspecting and packaging. Completion of the foregoing procedures make the finished gloves clearly distinguishable in character and use from the component strips.[4]

---

[3] Exhibit A is representative of the merchandise in issue, a finished glove  Exhibit B is representative of the front and back panels of the glove as manufactured in and exported from Hong Kong

[4] Accordingly, the substantial transformation undergone by the merchandise in issue in Haiti would likewise fully meet the "country of origin" test used in connection with the marking statute (19 U.S.C. § 1304), which the defendant contends is applicable herein.

In concluding that the assembly and processing of the merchandise in issue has transformed the same into an export of Haiti, the court need not be concerned with the manner of shipment of the glove panels from Hong Kong to Haiti. The court is in full agreement with decision of customs in C.S.D. 80–10, *supra,* holding that the manner of shipment from the "first" (Hong Kong) to the "second country (Haiti), in which latter country processing takes place, is not relevant to the determination of the question as to whether the first or second country is the country of exportation.

The court is not unmindful of the possibility that importers may seek to evade the restrictions contained in agreements such as the bilateral textile agreement between the United States and Hong Kong by attempting to divert products into the commerce of an intermediate country. Article 8(1) of the Multi-Fiber Agreement [5] provides that "The participating countries agree to avoid circumvention of the Arrangement by trans-shipment, re-routing, or action by non-participants." Article 8(2) thereof binds the participants to "collaborate with a view to taking appropriate *administrative* action to avoid such circumvention * *  * " [Emphasis supplied.] From the foregoing provisions it is clear that attempts to circumvent the agreement are to be dealt with through administrative and diplomatic channels and not through judicial process and intervention.

From the record presented for determination in this action, the court finds that Haiti is the country of exportation of the merchandise in issue. The court further finds that the bilateral textile agreement between the United States and Hong Kong is inapplicable to the stipulated facts herein and that the merchandise in issue, therefore, cannot be denied entry into the United States because of the lack of a Hong Kong export license or visa.

Let judgment be entered accordingly.