**DOLLIFF & COMPANY, INC.**

v.

**UNITED STATES.**

**C.D. 4755;  Court No. 73-5-01217.**

United States Customs Court.

July 7, 1978.

Doherty & Melahn, Boston, Mass. (William E. Melahn, Boston, Mass., of counsel), for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D.C. (Laura D. Millman, Trial Atty.), for defendant.

RICHARDSON, Judge:

The merchandise in this case consists of dacron polyester fabric which was exported from Canada in 1970 and 1971 and classified in liquidation upon entry at New Bedford, Massachusetts under TSUS item 338.30, as modified by T.D. 68–9, as woven fabrics, of man-made fibers, other, at various rates of duty which were assessed upon the full value of the merchandise. It is claimed by the plaintiff-importer that the merchandise should be classified under TSUS item 806.20

as articles exported for repairs or alterations, with duty assessed only upon the value of the processing outside the United States, in this case, Canada. The issue in the case is whether the processing of the fabric in Canada constituted a mere "alteration," or resulted in "the creation of a new and different article."

The essential facts concerning the processing operation in Canada are not in dispute. The domestic loom product is exported as *greige goods* in rolls of approximately 800 to 1,000 yards in length and approximately 118 to 119½ inches in width. It is returned as *finished fabric* suitable for manufacture into curtains, folded over double, widthwise, and cut in lengths of approximately 60 to 80 yards. In Canada the greige goods are subjected to a number of operations, consisting of heat-setting, chemical-scouring, dyeing[1] and heat-setting a second time during which finishing chemicals consisting of melamine resin for anticreasing characteristics, an antistatic chemical, and a softener chemical are applied to the fabric in this final stage. The initial heat-setting treatment serves to stabilize the fabric through the elimination of shrinkage.[2] Scouring removes sizing and impurities from the fabric. And the second heat-setting treatment induces a permanent adherence of the finishing chemicals to the fabric during the drying stage of the processing. The finished fabric is then inspected, folded and shipped back to the United States.

Although the foreign processing to which the greige goods in this case were subjected, and which was viewed by the court and counsel, was designed to prepare these goods for manufacture into curtains, it was brought out that a modification of the finishing operations could be made which would render the finished fabric suitable for use in apparel industries in the manufacture of undergarments and blouses. In comparing the greige goods with the finished fabric in this case, Roger Normandin, plant manager for Consolidated Textiles,

[1] Only the colored fabrics are dyed; the white fabrics receive a double scouring in lieu of dyeing.

[2] The greige goods have a shrinkage rate of 3 to 4 percent as compared to a shrinkage rate of less than 1 percent for the finished fabric.

Ltd. of Drummondville, Quebec, Canada, the foreign finisher in this case, testified on recross-examination (R. 162):

Q. Do you see any difference in quality as far as use in the home between the finished goods and the greige goods?—A. Well, the finished goods are more attractive.

Q. Are they more attractive? Are they useful? Do they wrinkle as easily as the greige?—A. I would say that the performance of the finished goods, in certain respects, is slightly better or, like for the creasing, it is going to perform better. I would say, yes, but with reservation.

Q. And what about the hand, is the greige as soft as the finished good?—A. The finished good is softer.

Q. What about the ability to resist static and dirt, is the greige as good as the finished goods in that respect?—A. No.

Q. What about the ability to be draped, the drapability of each, is the greige one that would hang as well as the finished?—A. Probably not, no.

And on the matter of usage of the greige goods *vis-à-vis* the finished fabric, Kenneth V. Chace, president of Berkshire Hathaway, Inc. of New Bedford, Massachusetts, the manufacturer of the greige goods herein, testified on recross-examination (R. 111-12):

Q. When you sold the greige goods, at the time you sold them, to whom did you sell them?—A. We would sell the greige goods to a converter.

Q. Would he turn them into curtains without finishing?—A. No, no.

Q. When you sell the finished goods, to whom do you sell them?—A. To a decorator-jobber.

Q. And would he, consequently, either hire out or cut them into curtains?—A. His customer would.

Q. So that the use of the greige goods, by the buyer of the greige goods, and the use of the finished goods by the buyer of the finished goods, is different?—A. Yes.

Earlier, the witness testified on cross-examination that the price at which his company sold the greige goods to converters was less than the $1.50 to $1.60 a yard price at which it sold the finished fabric to jobbers (R. 83-85).

Plaintiff argues that the changes made in the greige goods as a result of the finishing operations performed on them did not change the *classification* of the goods as woven fabrics of man-made fiber, and as such, the changes were within the ambit of the term "alterations" as provided for in item 806.20, that the Canadian processing did not change the *use* of this product, and that the finished goods are not a *new* and *significantly different* article from the greige goods. The Government argues that the foreign processing created a new article of commerce and did not result in a mere "alteration" of the old article.

The court is of the opinion that the imported finished fabric is not the same article as the greige goods exported to Canada.

The merchandise exported to Canada is known in the trade as greige goods, while the imported product is known as finished fabric. The greige goods are cheaper than the finished fabric. Samples of the greige goods and finished fabric before the court readily disclose that the former are somewhat coarse to the touch while the latter are soft to the touch. The greige is exported in *rolls* of from 800- to 1,000-yard lengths while the finished fabric is imported in *folds* of from 60- to 80-yard lengths in which form they are apparently offered to the cutting-up trades. In Canada the heat settings cause the filament fibers of the greige to become fuller, i. e., to blossom, with the result that they are physically different after such treatment than before.

And finally, the greige and finished fabrics are offered for sale and sold in different markets to different classes of buyers, with the former being sold either to converters who finish them, or in the greige goods commodities market, while the latter are sold to decorator-jobbers who cause them to be made up into curtains. And such divergence of marketing practices here

is underscored by the evidence in the record which reveals that the respective classes of buyers are concerned with entirely different characteristics. Hence, where converters and purchasers in the commodities market are concerned with technical information such as the number of picks and ends, denier, construction, and the warp and filling yarns of the greige goods, the decorator-jobbers are concerned with color and performance qualities of the finished fabrics such as light-fastness, hand, stiffness, tear strength, crease resistance, and shrinkage resistance.

In sum, greige goods and finished fabric of polyester fiber are shown to differ in name, value appearance, size, shape, and use. Such product differences between steel *slabs* processed in Canada and steel *ingots* exported from the United States, led our appellate court in *A. F. Burstrom v. United States*, 44 CCPA 27, C.A.D. 631 (1956) to reject the contention advanced by the importer in that case that the slabs had been merely "altered" from the ingots, within the meaning of paragraph 1516(g) of the Tariff Act of 1930, as amended, the court concluding that the two products were not the *same articles*. Our appellate court said there (p. 30) "Clearly the conversion of ingots into slabs does convert them into something else."

In *C. J. Tower & Sons of Niagara, Inc. v. United States*, 45 Cust.Ct. 111, C.D. 2208 (1960), involving merchandise more closely identified with that at bar, finished cloth backing, processed in Canada by the stretching, dyeing, and sizing of cotton drills known as greige goods, was held by the Customs Court to be a new article rather than an alteration of the greige goods within the purview of paragraph 1615(g) as claimed. There the court differentiated between the two products in terms of color, width, length, porosity, in the distribution of the threads in the weave, in weight, tensile strength, texture, and suppleness. Citing the *Burstrom* case, the court also said (p. 115):

. . . The exported merchandise is known in the trade as greige or grey goods, while the imported merchandise is finished cloth backing and is ready to be coated or the abrasive applied, in order to produce a coated abrasive. Although Mr. Bratton testified that the cloth was designed specially for the purpose intended, it is evident from an examination of the samples that the grey goods could have been used in various ways, whereas the finished cloth backing has a much more limited use and is peculiarly adapted for use in the manufacture of coated abrasives.

Although some points of comparison of the products in the *Tower* case differed with criteria relied upon by the court in the *Burstrom* case, it is clear that differences in *commercial nomenclature* and *usage* of the exported and imported products influenced the court's conclusion in both cases, as indeed, it does in the instant case. And as to plaintiff's argument that a change in classification does not result from the foreign processing of the exported product [i. e., both the greige goods and the finished fabric would be classifiable under the provision for woven fabrics, of man-made fibers, in TSUS item 338.30], this circumstance is "immaterial where the foreign processing has created a new article." *A. F. Burstrom v. United States, supra*, p. 30.

If the only change made in the exported greige goods in this case was in the dyeing of the material, as was the fact in *Amity Fabrics, Inc. v. United States*, 43 Cust.Ct. 64, C.D. 2104 (1959), the judgment would be for the plaintiff. However, as has been pointed out above there were significant changes, in addition to dyeing, in the material exported to Canada in this case, and had these changes been evident in the *Amity Fabrics* case, it is submitted that the result would have been the same as here. See the holding of the court in the *Amity Fabrics* case on page 68: ". . . the identity of the goods was not lost or destroyed by the dyeing process; no new article was created; *there was no change in the character, quality, texture, or use of the merchandise*; it was merely changed in color."

The court is of the opinion that where, as here, foreign processing of an exported article, to whatever degree, produces such changes in the performance characteristics of the exported article as to alter its subsequent handling and uses over that which earlier prevailed, the resultant product is of necessity a new and different article.

For the reasons stated the court is in agreement with defendant that the foreign processing created a new article of commerce. In view of this conclusion, it is unnecessary to consider defendant's alternative contention relative to inadequacy of evidence of the costs of alterations. The action is dismissed.

Judgment will be entered herein accordingly.